SMALLEY & ADAMS AND N. B. & H. WELLS, *v.* SAMUEL HICKOK AND HORATIO HICKOK.

FRANLIN, *January,* 1840.

*(In Chancery.)*

The receipt of the second instalment, in a decree of foreclosure, when the first is overdue and unpaid, is a waiver of any forfeiture which has *then accrued,* but does not affect the decree in relation to subsequent instalments.

A promise, without consideration, made after the terms of a foreclosure have expired, to receive the amount due and to quit-claim the land, is void.

After foreclosure had expired, the assignee of a mortgagor contracted to pay the mortgagee a certain sum, exceeding the amount due on the mortgage, and to receive a deed of the land, and paid as much as was due on the mortgage and gave his note for the balance, and received his deed. Held; this was a note on good consideration, and chancery declined to interfere.

That the orators were induced to enter into this contract, from the peculiar situation of their other business, does not alter the case.

THE orators, in their bill, stated, in substance, that, on the 10th of March, 1825, Eli N. Johnson executed a mortgage of certain land and buildings, in St. Albans, to the defendants, to secure six notes, of that date, of $100 each, payable in beef cattle, on the first day of November, or in grain, on the first day of March, following, one note annually ; that on the first of March, 1826, Johnson conveyed a part of the same land to N. B. & H. Wells, who conveyed a part to Watson ; that, at a session of the supreme court, at Burlington, in January, 1830, the present defendants exhibited their bill of foreclosure, against Johnson, Wells and Watson, on said mortgage, of which they had due notice, but made no appearance ; that they took a decree of foreclosure, and, by said decree, $415,72, being the amount then due on the four first notes, and the cost, $24,67, was ordered to be paid by the first Tuesday in January 1831, with interest. Also, $129,84 in grain or in money, on the first day of March, 1830, being the amount of the fifth note ; and $133,84, in cattle or in money, Nov. 1, 1830, or $135,84, in grain or in money, on the 1st day of March, 1831, being the sixth note ; that, in December, 1830, Johnson procured Smalley & Adams, to raise, for him, the money to pay the first instalment, specified in said decree, and gave them a mortgage on the land to secure them therefor and for other liabilities ; he telling

them, and they supposing, that the decree did not include the
two last notes ; that Johnson, on the 31st of December, 1830,
paid to the clerk of the court, on said decree, $466,12,
which the defendants, on the the third day of January, 1831,
received of the clerk ; that, in May, 1831, Watson conveyed
to Wells ; that, on the 31st of August, 1831, N. B. & H.
Wells mortgaged their part of the land, to H. & G. Vail, to
secure $331,00, payable, half in one year and half in eigh-
teen months ; that between March, 1825, and January, 1832,
Johnson and Wells erected buildings on the land, to the va-
lue of $2000, and Smalley & Adams had paid out money
on their liabilities for Johnson, depending on his mortgage ;
that, in January, 1832, the orators first learned from the de-
fendants, that the decree included all the notes and that the
time for payment had elapsed ; that Johnson had become in-
solvent and had absconded ; that the orators, understanding
from defendants that they would still receive the amount
due on the mortgage, raised the amount and applied to the
defendants to receive it, which they declined doing, insist-
ing that the property had become theirs unconditionally ; that
the defendants, professing friendship, offered to receive five
hundred dollars and release the land, and threatened an ac-
tion of ejectment, therefor, if this was not done ; that N. B.
& H. Wells, being engaged in trade and much embarrassed,
and owning the greatest value in the premises, and fearing
the consequences to their credit, finally concluded to close
with said offer, and the orators paid the defendants $300,
and gave their note for $200, and took of the defendants a
quit-claim deed of said land.   And the orators prayed to be
relieved from the payment of said note for $200, and that
the defendants might be decreed to pay to the orators all
that had been paid to the defendants, over and above the
amount of the defendants' mortgage.

The defendants, by their answer, acknowledged the mort-
gage to the defendants, and the mortgagor's conveyance
to Wells and Watson, the bill of foreclosure and the decree,
but denied that the respondents, in that bill, did not appear,
but insisted that they did appear, by their solicitor, L. B.
Hunt, and that the decree was regularly made, with their
knowledge of its terms.   They disclaimed all knowledge of
any other conveyances, but admitted the payment, by John-

son, on the decree, and the receipt thereof by the present
defendants, and insisted that the decree expired, the balance
being unpaid. They also denied any assurance or promise
to receive the balance and give a release, except that defen-
dants afterwards said that, for Johnson's sole benefit, the de-
fendants offered so to sell. They further insisted that, after
the expiration of the decree, they made a *bona fide* sale to
the orators, for five hundred dollars, three hundred being
paid and two hundred secured by note. To this answer
there was a traverse. Testimony was taken in the cause,
and the orators' testimony proved the conveyances, as al-
leged in the bill, and the payment by Smalley & Adams for
Johnson ; that, before January, 1832, buildings had been
erected on the land, to the value of about three thousand
dollars, and that Johnson had become insolvent and ab-
sconded. The defendants also filed, in evidence, the dock-
et entries of the clerk of the court, in Chittenden county, of
the bill of foreclosure, which were as follows :

" January Term, 1830.

"Samuel Hickok, } Thompson & Sawyer.
  v.  }
" Eli N. Johnson, Noah B. } 
  Wells, Henry Wells } Hunt.
  and John Watson. }

" Bill taken as confessed, January 7, and referred to Master.
" To be paid on or before the first Tuesday of Jan-
  " uary, 1831,                                          $415,72
" Cost,                                                    24,67
                                                        ————
                                                        $440,39
" with interest from January 9, 1830.

" Also, the sum of $129,84, in grain or money, on the first
" of March, 1830.

" Also, the sum of $133,84, in cattle or money, Nov. 1,
" 1830, or the sum of $135,84, in grain or money, March 1,
" 1831.

"Received, Burlington Dec. 31, 1830, of Eli N. Johnson,

four hundred sixty dollars $\frac{12}{100}$, being the amount of debt and costs ordered to be paid by the respondents, in the above cause, on or before the first Tuesday of January, 1831."

"Received the above sum of four hundred and sixty-six $\frac{12}{100}$ dollars, of N. B. Haswell, clerk, January 3, 1831."

JOHN C. THOMPSON,
for THOMPSON & SAWYER."

It appeared from the testimony of Jacob Maeck, that he, being at St. Albans early in January, 1832, was informed by the orators, Smalley & Adams, that E. N. Johnson had made some arrangement with Samuel Hickok for an extension of the time of redemption of his mortgage and that they were ignorant whether such arrangement was made for the benefit or advantage of said Johnson, or of the subsequent incumbrancers, and he was requested, by Smalley & Adams, to call on Samuel Hickok and inquire whether any, and, if any, what agreement had been entered into for extending the time of redeeming said mortgage, and what said Samuel would agree to do in the premises, the said Smalley & Adams offering to make immediate payment of the money decreed, with interest. That he called on said Samuel and told him Smalley & Adams were ready to pay the redemption money as aforesaid, if he would receive the same, and he then put to him the inquiries and received the answers set forth in a letter which he wrote to Smalley & Adams. The letter was as follows:—

" January 14, 1832.
" Gentlemen,—I have just been and conversed with Mr. " Hickok, on your business. He is unable to say from " recollection, or to ascertain from his papers, whether " the other two instalments have been paid, but thinks " they have not, as the money belonged jointly to himself " and Horatio Hickok, and he finds no sums credited to Ho- " ratio Hickok that correspond with his proportion. He " says Mr. Hunt settled some of the St. Albans mortgages, " by check and note, but whether it was this or not, he is " unable to say. He is likewise now unable to say whether " he has ever made any assignment of the decree, or given " any quit-claim, but is quite sure he never has, and that the

" other two sums are ,yet unpaid. He further says there
" shall be nothing dishonorable on his part, and that he will
" now receive of you those sums, and he will enter a satis-
" faction of the decree on receiving his money and interest,
" the same as if it had been paid at the time they became
" due."

FRANKLIN,
*January,*
1840.

Smalley *et al.*
*v.*
Hickok *et al.*

The testimony of Henry W. Catlin, taken by the defendants, was to this effect :—That N. B. Wells came to S. Hickok's Store, in Burlington, in 1832, and said he did not wish to lose his property for the amount for which it was foreclosed and represented the property worth *much more;* that the same day, or the next, Henry Adams came in and represented that the property was worth more than it was foreclosed for, and wanted to see what he could do for Wells, and , wanted to know on what terms Hickok would release to Wells and said he thought it was a hard case for Wells to lose the property for that amount. That Wells and Adams were in at Hikok's Store several times on this business and agreed with Hickok on the terms on which the property was to be conveyed to Wells; and Adams signed the note to Hickok, as he was unwilling to take Wells' note, and the witness understood that was a final settlement of the matter.

*Smalley & Adams,* for orators.

The note in question is without consideration and was obtained from the orators, by compulsion, in order to relieve their estate from an unlawful and oppressive suit, and ought therefore to be cancelled, and the excess, exacted over what was due on Johnson's mortgage, ought to be paid back to the orators.

1. The decree, under which the defendants pretended a title to the mortgaged premises, was irregular and not conclusive upon the orators.

2. But, admitting the decree to have been regular and valid, yet the defendants, by accepting, on the third of January, 1831, of $466,12 on the decree, after it had become absolute, opened the foreclosure and gave the orators the right to redeem the premises on payment of the sum due on the mortgage debt.

It seems to be the established rule, in courts of equity, that if the mortgagee, after having obtained a decree of foreclosure, take out process on the bond or other counter secu-

rity to enforce payment of his mortgage money, it operates as a waiver of his rights under the decree. 3 Powel on Mort. 1002: ib. 1015, in Note, T. *Perry* v. *Barker*, 13 Vesey, 197. 1 E. C. Ab. 317, Pl. 3. *Lovell* v. *Leland*, 3 Vt. R. 581. *Strong* v. *Strong*, 2 Aikens' R. 373. 6 Hovendon on Frauds, 201. 4 Kent's Com. 175. 2 Swift's Digest, 198. 1 Vt. R. 395. 9 Cowen's, R.346. *A fortiori*, then, the actual receipt of the greater part of his mortgage money, after foreclosure and decree absolute, opens the foreclosure and revives the right of redemption.

The acceptance, by the defendants, of the amount paid by Johnson, after the decree was absolute, is conclusive evidence that the right to redeem existed on the third of January, 1831, by the agreement of the parties. This, of itself, restored the relation of mortgagor and mortgagee, and the decree, from that time, was a nullity, and equity will not permit it afterwards to be set up as a clog to the right of redemption, any more than it would any other agreement entered into by the parties to impair or obstruct this equitable right, inherent in every mortgage. 1 Powel on Mort. 116, *et seq.* 2 Johns. C. R. 30. *Jennings* v. *Ward and others*, 2 Vernon, 520. Foublanque's Equity, 528. Moreover, the defendants always treated it as a redeemable estate until March 22, 1832. The defendant, S. Hickok, in his answer, virtually admits that an agreement to waive the decree was in fact entered into between him and Johnson, for, when applied to by the orators, personally, in January, 1832, he says that he informed them that he would sell the premises to Johnson on payment of the balance of his mortgage debt, and adds that he also, at the same time, informed them that " he had never offered " to sell said premises to any one else than said Johnson, on " these conditions." On the 14th January, 1832, this defendant considered his interest in this estate as that of mortgagee and informed J. Maeck, who applied to him on behalf of the orators, that he would receive of them his mortgage money in satisfaction of his claim. These admissions, in connection with the facts that Johnson, after the decree was absolute, paid the larger portion of the mortgage debt, and that he and his assigns always remained in possession of the premises, and that the defendants asserted no claim to them until after Johnson had left the country, and persons not

parties to the decree had become interested in them, afford strong evidence of an agreement, in fact, between the defendants and Johnson that the right of redemption should remain unimpaired by the decree. Whether this agreement was intended to be secret and confidential between the parties, for their secret purposes, it is unnecessary to inquire. At all events the defendants ought not, in equity, to be permitted by any after thought to annul or qualify it by alleging or intimating that it was merely for Johnson's benefit or an act of special favor to him. If Johnson had the right, from any cause whatever, to redeem, then it was a mortgage with the legal incidents of a mortgage, and his assignees took his right and were not barred of it when they applied to the defendants to redeem, in March, 1832. 4 Kent's Com. 156. 1 Powel on Mort. 261: ib. 310.

The orators, therefore, when they applied to the defendants, on the 22d March, 1832, had a right to redeem the premises on payment of the amount secured by the mortgage and the defendants were bound to receive it and discharge their lien. Statute, 170.

Instead of receiving their due, when tendered, they for the first time asserted a false claim of absolute title to the premises, under the decree, and threatened a suit in order to extort from the orators more than their due. It is contrary to equity and good conscience to permit the defendants to retain money or enforce a promise obtained by their refusal to do what, by law, they were bound to do, and by asserting a claim repugnant to every principle of justice and equity. A suit, in execution of the defendants threats, would have cast suspicion upon the orators' title to a large amount of real property,— would have embarrassed them in the enjoyment of it, and might have had an injurious effect upon their credit and business in other respects, To dispel this cloud on their title, and to avoid the consequences reasonably to be apprehended from a vexatious and unfounded suit, the orators paid their money and executed the note from which they now ask to be relieved.

The case comes clearly within the principle if not the letter of those cases where it has been held that money extorted by taking undue advantage of the party's situation, as withholding a pledge until the payment of illegal interest, exact-

ing an illegal fee for license to a publican, and excessive toll, may be recovered back in an action for money had and received. 2 Stark, Ev. 110. *Morgan* v. *Palmer*, 9 C. L. R. 232. Douglass, 472, 697. Chitty on Cont. 192. Comyn on Cont. 315. *Astley* v. *Reynolds*, 2 Strange, 915. *Ripley and others* v. *Gelston*, 9 Johns. R. 201.

The forbearance of an unlawful suit can never be a good consideration for a promise ; nor can a promise obtained by the imposition of unlawful terror, whether from the threat of an unfounded suit or otherwise, be enforced. *Jones* v. *Ashburnham*, 4 East, 455. In the civil law the same principle is recognized. 1 Pothier on Ob. 22, § 43.

But it is urged by the defendants that the orators objected, at the time the money was paid and the note executed, to the unjustness of defendant's claim to the premises, and, after all, submitted, and therefore they ought to pay, because, by submission, they satisfied the defendants. This is a miserable sophism ; objecting, as a bar to the relief sought, the very thing objected to by the bill. If it was contrary to equity and good conscience for the defendants to claim more than was due, it is equally contrary to equity and good conscience to defend their extortion.

This court has jurisdiction, and is the proper tribunal to compel the discovery and grant the relief sought. The oppression complained of originated in an abuse of its proceedings, which ought to be corrected here.

One great branch of equity jurisdiction is to afford relief, by way of preventing vexatious litigation, against instruments void at law, by decreeing them to be given up and cancelled. For, though a writing may be known to be void and the party may have the means of proving it void, as having been obtained on imposition, or from being usurious or forged, yet, as such instruments may be made the ground of a vexatious demand, or may form a cloud upon the title of another, a court of equity will exercise its jurisdiction on such instruments and take away the means of injury and annoyance. That is what is required in this case. The note in question, though void at law, as having been obtained by compulsion, may be negotiated and be made the ground of vexatious and oppressive litigation; and ought, therefore, to be cancelled upon principles well settled in courts of equity. Jeremy's

Equity, 499, 502. 1 Mad. Ch. 154. *Reigal* v. *Wood*, 1 Johns. C. R. 402. *Apthorp* v. *Comstock*, 1 Hopkins' R. 143. Foublanque's Equity, 718 : ib. 697. *Bushnell* v. *Hosford and others*, 4 H. R. 301. Mitford's Pleadings, 90, 104, 106, 116. *Hodgson* v. *Murray*, 2 Cond. C. R. 526. *Peaks* v. *Highfield*, 1 Russell, 559. *Wymer* v. *Callender*, 1 Russell, 293. *Hood* v. *Aston*, 1 Russell, 412. *Grover* v. *Hugell*, 3 Cond. C. R. 467. *Lord Portarlington* v. *Soulby*, 8 Cond. C. R. 298. Fonblanque's Equity, 60. Newland on Cont. 493.

*Smith & Aldis*, for defendants.

I. The premises, included in the decree, were the absolute property of the defendants on the 22d March, 1832, when they conveyed the same to the orators.

1. The decree was obtained in the usual way, *after the appearance of the defendants*, and could not have been impeached either on the ground of fraud or mistake. Nor was the omission of the orators to redeem owing to anything but their own negligence. The decree was, of itself, *notice* to all persons subsequently taking a conveyance of the premises.

2. The acceptance of the instalment, due on the first Tuesday of January, 1831, did not open the decree. In order to have the acceptance of payment on a decree, revive the equity of redemption, the payment should be so made and received as to show that the parties still *intended* to treat it as a mortgage. In this case, it is manifest that S. Hickok had no such intent, but only supposed he was receiving the instalment due by the decree.

Again, even if the decree was opened by the payment, the neglect of the orators to pay the instalment due on the first of March, 1831, closed it again.

3. There never was any agreement on the part of the defendants to extend the time of redemption.

4. There is no instance where a man has been let in to redeem *after the equity of redemption has expired* by virtue of any parol agreement or declaration, or by reason of any over value of the estate. 3 Pow. on Mort. 10, 10.

The declaration to Maeck gave the orators no new or additional right.

II. But if the orators, by filing a bill to redeem, might, on the 22d of March, 1832, have been entitled to an equity of

redemption, they cannot *now* be allowed to raise the question above discussed. The settlement made between the orators and defendants, at that time, was understood by all to be made for the very purpose of settling and merging all the matters then in dispute between them. At that time the orators knew all the facts which are set forth in the bill; they knew all their legal and equitable rights, and if they were not willing finally to adjust and settle the controversy, at that time, they should have brought a bill, to be let in to redeem. Had they brought such a bill, instead of procuring a release from the defendants, they might have successfully resisted it, in which case they would have been entitled to the whoie of the property.

If the orators were not willing *to run this risk*, they ought at least to be compelled to pay for the security against the risk, which they now enjoy by the release from the defendants.

The right of the orator was, at least, a doubtful claim and the compromise of a doubtful claim is a good consideration for a note.

Again, the orators obtained, by the release of the defendants to them, the title of the defendants to the premises; a title which may prove not a little advantageous to the orators in patching up their own title as against Johnson.

III. There is not the slightest evidence in the case to show that the defendants took advantage of the situation or necessities of the orators.

As to their *situation*, they knew all their equitable rights, the proper mode of enforcing them and the risk and doubt that might attend an appeal to a legal tribunal. In all this there was nothing by which the defendants could take advantage of them.

As to their *necessities*, there is no pretence that any of the orators were embarrassed except N. B. & H. Wells, and as to them there is no evidence in the case.

The opinion of the court was delivered by

COLLAMER, Chancellor.—The decree of foreclosure was by a court having jurisdiction of the subject matter, and the parties, and was procured without fraud, and must be binding until reversed; though it is not now the usage of this court to include, in a decree of foreclosure, payments, not due, to be made in specific articles of property.

It is a general rule that the receiving, in whole or in part, the mortgage debt, included in a decree of foreclosure, after it has become absolute, will let in the mortgagor to redeem. But the whole of that doctrine amounts to but this, taking money for which a forfeiture has accrued, is, in chancery, a waiver of such forfeiture, and of all forfeiture then existing. This is all the authorites show. Hickok by taking the second instalment in the decree, when the first was over due, waived the forfeiture, then existing; but that did not vacate the decree as to the subsequent instalments, which the mortgagor remained bound to pay, according to the decree. The reason for this distinction is quite obvious.

A mortgagee may, by an unequivocal act or contract, with consideration, waive the foreclosure of a mortgage after it has become absolute, and, in such case, the mortgagor will be let in to redeem. The suing for the debt is such an act; though the suing for the balance of the debt, beyond the amount of the mortgaged property, is not;—rendering an account for rents and profits is such an act;—neither of these is pretended in this case;—treating the debt as still on foot, as an *existing debt*;—this, it is insisted, was done by Hickok. The saying by the mortgagee, before the expiration of the time of redemption, that he, after that time, will receive the debt and so inducing the mortgagor to suffer the time to expire would, probably, let him in to redeem; but his so saying, after it had expired, would have no effect, unless it was a contract made on legal and sufficient consideration. There is no allegation in the bill, nor any testimony tending to show, that the defendants made any such assurances before the decree had fully expired, and as to assurances given to Maeck, they were made after all was due and without any legal consideration. It was, therefore, to say the most, highly doubtful whether the orators had any ground for claiming to be let in to redeem. This might claim more consideration had the orators depended on that and filed their bill to redeem, but that is not their bill.

In that state of things the parties made a new contract. The orators gave their note to compromise and buy out the defendants' claim and title and took their absolute deed. This contract thus made and executed, was made without fraud, all the facts being equally known to both parties. The note

FRANKLIN.
January,
1840.

Smalley *et al.*
*v*
Hickok *et al.*

was taken without the abuse of any public authority, by the defendants. Nor was there, by the defendants, any unauthorized advantage of circumstances. That the peculiar situation of the orators' business and other affairs induced them to enter into a hard bargain, constitutes no reason for setting aside such contract, when that was unknown to the other party ; nor is it clear that it was even an improvident bargain. The defendants claimed that they had an absolute title. The orators claim they ought to have been let in to redeem. If this was their right they should have trusted to this right and filed their bill to redeem. But, unwilling so to do, they have given their note and taken of the defendants their deed, and must now abide by the contract. If we set aside the note, we should set aside the defendants' deed and restore all to their former rights ; but this the orators are unwilling to risk and do not ask to have done. As they insist on holding all they obtained by the contract, they should abide by its terms.

Bill dismissed.